Randall S. Luskey (SBN: 240915)
rluskey@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Tel:  (628) 432-5100
Fax: (628) 232-3101

Meighan Leon (SBN: 315574)
meighan.leon@dealmaker.tech
**NOVATION SOLUTIONS, INC.
(O/A DEALMAKER)**
1716 South Catalina Avenue
Redondo Beach, CA 90277
Tel: (310) 944-8844

Brian J. Capitummino (*pro hac vice* forthcoming)
bcapitummino@woodsoviatt.com
Michael Ostrander (*pro hac vice* forthcoming)
fostrander@woodsoviatt.com
**WOODS OVIATT GILMAN LLP**
1900 Bausch & Lomb Place
Rochester, New York 14604
Tel:  (585) 987-2800
Fax: (585) 454-3968

*Attorneys for*
*Plaintiff Novation Solutions, Inc. (O/A Dealmaker)*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVATION SOLUTIONS, INC. (O/A DEALMAKER),<br><br><br>Plaintiff,<br><br>v.<br><br>ISSUANCE, INC. and DARREN MARBLE,<br><br><br>Defendants. | **Case No.**<br><br>**COMPLAINT** |

COMPLAINT

Plaintiff Novation Solutions, Inc. (O/A DealMaker) ("Plaintiff" or "DealMaker"), by and through its undersigned attorneys, Woods Oviatt Gilman LLP, as and for its Complaint against defendants Issuance, Inc. ("Issuance") and Darren Marble ("Marble" and, together with Issuance, "Defendants") alleges as follows:

## NATURE OF THE ACTION

1.     By this action, Plaintiff seeks redress for Defendants' deceit, theft, and misconduct in fraudulently inducing DealMaker, under the guise of false pretenses, to gain access to Plaintiff's confidential information, intellectual property, and trade secrets, and then proceed to copy, transfer, and/or misuse Plaintiff's sensitive, proprietary and confidential information to compete, directly and unfairly, against Plaintiff.

## THE PARTIES

2.     DealMaker is a federal corporation incorporated pursuant to the Canadian Business Corporations Act with offices located at Toronto, Ontario, Canada, Austin, Texas, Tampa, Florida and New York.

3.     Issuance is a corporation organized and existing under the laws of the State of Delaware with offices at 17804 Bromley Court in Encino, California.

4.     Marble is a natural person and resident of the State of California, with an address in Beverly Hills, CA 90212.  Upon information and belief, Marble is a co-founder, the Chief Executive Officer, Chief Financial Officer and Secretary of Issuance.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction, pursuant to 28 U.S.C. §1332, because the amount in controversy exceeds $75,000 and there exists complete diversity of citizenship.  Additionally, because the subject matter of the trade secrets that have been converted by Defendants are related to products or services that are used or intended for use in interstate or foreign commerce, this Court has jurisdiction

pursuant to 28 U.S.C. §1331 as a civil action arising under the Constitution, laws, or treaties of the United States, and in particular 18 U.S.C. §1836.

6. Venue is proper pursuant to 28 U.S.C. §1391 because Defendants reside in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the district.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**A. BACKGROUND**

7. DealMaker was founded in 2015 and is a financial technology company offering its corporate and commercial customers a cloud-based platform for raising capital online. DealMaker's proprietary technology provides the tools for companies to manage all aspects of a streamlined capital raise in one centralized platform (the "Platform" or "DealMaker Platform") and facilitates the customer's ability to efficiently secure investments online.

8. DealMaker's innovative approach has advanced the capital raising space by providing a suite of primary issuance, shareholder management and capital raising solutions that empowers customers to access capital faster. Using the Platform, companies conduct their own private offerings pursuant to Regulation A/A+, Regulation D, Regulation S and/or Regulation CF exemptions from the securities registration requirements of the Securities Act of 1933, as amended (the "Securities Act").

9. The innovative Platform compiles all the functionality required for customers to complete their own capital raise. The Platform: enables customers to optimize subscriber conversion with real-time data that tracks and monitors capital raising efforts and subscriber progress; provides a streamlined process for onboarding subscribers with technology-driven processes to access online subscription materials; offers integrated digital payment options to facilitate the investment process; provides customers with complete Know Your Customer ("KYC"), anti-money laundering ("AML") subscriber reviews, and accredited

investor verifications with results recorded on the customer's offering dashboard; provides DealMaker Compass, an analytics suite of products that includes a patent pending Investor Ranking Algorithm and data analytics tools, allowing issuers to understand and predict the propensity to invest and probability of funding from each subscriber ("DealMaker Compass"); and, through DealMaker's shareholder management portal named "DealMaker Engage," enables customers to interact with investors throughout the capital raising process ("DealMaker Engage").

**B. PLAINTIFF'S CONFIDENTIAL INTELLECTUAL PROPERTY AND TRADE SECRETS**

10.     The technology and skill required to seamlessly compile the Platform components is not a matter of public knowledge: other than DealMaker employees, only a person with access to the DealMaker Platform and the skillset to reverse engineer Platform components could copy the Platform.

11.     DealMaker painstakingly developed the beta Platform over three years during the period from 2015 to 2018 through extensive research and development ("R&D") before "going live" with the Platform and making it available to customers. DealMaker continues to extend considerable efforts and expense on R&D annually, to optimize the Platform and enhance its best-in-class functionality.

12.     DealMaker's founders designed the Platform to target capital raising challenges they had observed in their own day-to-day legal practice over a combined two decades.  Drawing on this experience, DealMaker: surveyed early users of the beta Platform to better understand their capital raising needs in numerous jurisdictions and the ideal question flow to onboard subscribers; surveyed security and software specialists to assess and compile available supportive software tools and AML/KYC search tools that could be directly integrated with the Platform; employed numerous software developers, web designers and engineers to develop, test, deploy and monitor the Platform software; negotiated arrangements with payment processors and escrow companies to facilitate online payments and created DealMaker's packaged pricing plans by bundling Platform functionality with

offering-specific service needs.

13.     Subsequent to the initial launch, DealMaker continued to enhance the Platform by designing an application programming interface ("API"), improving webhook functionality, and integrating "magic" links allowing clients to seamlessly integrate with the Platform.  DealMaker also developed its ancillary services such as DealMaker Engage and DealMaker Compass, acquired a marketing firm, and grew its relationship with an affiliated registered broker dealer and transfer agent to provide customers with the complete spectrum of services required to meet their capital raising needs ("Product Development").

14.     Through significant investments of time, money and human capital, DealMaker has identified the components necessary and created the online experience required for customers to generate their own successful offerings using the Platform.  DealMaker's Platform provides its customers with the suite of tools to raise capital exactly how and when the customer chooses.  In sum, DealMaker's Platform is the product of years of experience, R&D, Product Development and capital invested by DealMaker.

15.     DealMaker's extensive R&D and Product Development has made Plaintiff highly valuable and equipped Plaintiff with the hard-earned knowledge to offer its customers targeted and cost-effective pricing depending on their needs and the nature of their offering.  Among other innovations, DealMaker developed two product offerings:

  a. DealMaker "Basic", which is Platform functionality for traditional private placements in accordance with Rule 506(b) of Regulation D of the Securities Act, and

  b.  DealMaker "Plus", which is Platform services for equity crowdfunding under Regulation A, Regulation CF, and Rule 506(c) of Regulation D.

16.     It is conservatively estimated that DealMaker devoted at least 8,000 hours and two million ($2,000,000) dollars before bringing its Platform to the

marketplace and another ten million ($10,000,000) dollars on continuous R&D and Product Development thereafter.

17.    Further, DealMaker vigorously safeguards its proprietary and confidential Platform and associated trade secrets.

18.    To that end, all DealMaker employees, contractors and third party vendors are subject to confidentiality restrictions as a condition of their employment or vendor relationship.

19.    Even those potential customers who seek a demonstration of the Platform and its capabilities must agree to DealMaker's terms of service which contain extensive confidentiality restrictions and prohibitions against any other use or dissemination of DealMaker's proprietary software and confidential information. While prospective customers may review a sample demonstration, it permits "read only" access and provides viewers with no functionality, API or administrative capabilities.

20.    Further, DealMaker only grants administrative access to its Platform to customers who have a signed, written agreement with Plaintiff containing robust confidentiality protections. The files accessible with administrative access contain invaluable trade secrets and confidential information essential for reproducing the Platform's suite of tools. This information is only shared with customers who agree to maintain the confidentiality of the information. Among other things, a client is precluded under the terms of the agreement from receiving the confidential information about the Platform on behalf of one entity and then using it to "reverse engineer" the Platform for use by another entity.

21.    DealMaker's extensive investment in R&D and Product Development, the innovative "look and feel" of its Platform, Plaintiff's efforts to keep confidential its proprietary confidential information and trade secrets, and the goodwill Plaintiff has generated in the marketplace have all provided Plaintiff with a distinct competitive advantage over its competitors.

**C. MARBLE INDUCES DEALMAKER TO GRANT HIM ACCESS TO THE PLATFORM**

22.    In or about March 2022, Marble approached Plaintiff and inquired about forming a strategic collaboration with DealMaker.

23.    At the time, Marble was also the CEO and CFO of Crush Capital, Inc. ("Crush Capital"), a company he founded with Todd Goldberg in 2020.

24.    Upon information and belief, Crush Capital was and remains the creator and owner of the "Going Public" series, a webcast video series that profiles corporate founders and their capital raising efforts.

25.    Marble told DealMaker that he was looking for a technology provider for the back-end processing of the Going Public series.  Marble emphasized that he was shifting his focus to Crush Capital and moving away from building technology services as his core business.  Marble's investment processing platform, known as "Issuance", did not have the technological capabilities to support a high volume of Going Public investors.   Marble proposed that DealMaker could supply the technology and services required.

26.    On or about June 17, 2022, Marble spoke to Michael Werry, the DealMaker Vice President of Sales ("Werry") while both were attending a New York conference.  Marble advised Werry that Crush Capital was in the process of obtaining approval from the United States Securities and Exchange Commission ("SEC") for its own offering under Reg A+ (the "Offering"). Marble represented that he was interested in using the DealMaker Platform to conduct Crush Capital's Offering and also desired to enter into a broader enterprise agreement to use DealMaker's Platform for other capital raising ventures. Marble expressed repeated doubt about the viability and direction of his Issuance platform.

27.    Marble further led DealMaker to believe that he wanted to access the Platform's capabilities and determine its suitability in order to further the broader strategic collaboration he proposed.  Marble suggested that the parties could commence their relationship by supporting an as-at-the-time unnamed offering, that

1   would serve as a "try-before-you-buy" validation of the parties' mutual goals.

2      28.   In reliance on Marble's representations, and to enter into a more
3   extensive enterprise agreement for DealMaker to service his other and further needs,
4   Plaintiff agreed to grant Marble limited access to its Platform demonstration
5   pursuant to Plaintiff's terms of service.

6      29.   But for Marble's representations that he intended to use the Platform
7   for the Crush Capital Offering and/or desire to enter into an enterprise contract with
8   DealMaker, Plaintiff would not have granted Marble or his affiliates a
9   demonstration, or any, access to the Platform.

10     30.   On or about June 29, 2022, Werry provided Marble with a
11  demonstration of the Platform.  Thereafter, having reviewed the capabilities of the
12  Platform, Marble confirmed his intention to move forward with a license for the
13  DealMaker Platform.  Marble proposed to use DealMaker for an offering on behalf
14  of Pieta LLC ("Pieta"), operating as BlueChipart.com, to explore how the Crush
15  Capital Offering and a broader potential enterprise relationship with DealMaker
16  would work.

17     31.   To that end, Marble requested that Werry provide a contract for Pieta
18  to execute.

19     32.   Additionally, Marble requested that DealMaker grant Marble's
20  colleague, Vinny DiDonato ("DiDonato"), CTO of Going Public and Pieta, access
21  to a demonstration on the Platform.  Marble explained that he wanted DiDonato to
22  gain access to the Platform to assist with onboarding Pieta and to assess how
23  DealMaker would support the Crush Capital Offering under the enterprise
24  agreement.  At Marble's behest, DealMaker granted DiDonato access to the Platform
25  demonstration previously viewed by Marble.  DiDonato requested information
26  regarding DealMaker's customization capabilities, including subscriber tracking and
27  analytics.

28     33.   Plaintiff provided Marble with a contract order form subject to

DealMaker's confidentiality protections and terms of service.  But for Marble's representations that he desired to enter into an enterprise contract with DealMaker and/or use the Platform for the Crush Capital Offering, Plaintiff would not have provided a contract to Marble or Pieta nor granted them access to the Platform.

34.     Although DealMaker was unaware of it at the time, Plaintiff would subsequently learn that Marble had only recently formed Pieta, on or about June 21, 2022.  Upon information and belief, Pieta is a limited liability company organized and existing under the laws of the State of Delaware with offices in Beverly Hills, California.  Upon information and belief, Marble is also the Managing Member of Pieta and wholly controls the company.

**D. THE AGREEMENT**

35.     In late June 2022, Marble requested that DealMaker add a special term to its order form to clarify that Pieta was not prohibited from competing with DealMaker.  The term is as follows:

> Nothing in these Terms and Conditions or the Dealmaker Terms of Service (collectively, the "TOS" ) shall prohibit Customer from developing or having developed for it , products, services, concepts, systems, or techniques that are similar to or compete with any products, services, concepts, systems, or techniques provided by Dealmaker, provided that Customer does not otherwise violate any of its obligations under the TOS including but not limited to, with respect to information described as Confidential Information or intellectual property under the TOS and the obligations of the parties pertaining thereto. This Section shall be considered part of the Subscription Order pursuant to Section 15.10 of the DealMaker Terms of Service.

36.     DealMaker agreed to the addition of the above-quoted provision, <u>only because</u> Pieta, and the individuals associated with it, agreed not to violate any of its obligations under the Terms of Service "*including but not limited to, with respect to information described as Confidential Information or intellectual property under the TOS and the obligations of the parties pertaining thereto.*" (Emphasis added).

37.     On or about July 3, 2022, Marble executed, on behalf of Pieta, the DealMaker order form for access to and use of DealMaker's Platform "Plus"

COMPLAINT

services (the "Order Form").

38.   The Order Form expressly incorporates DealMaker's Terms of Service ("Terms" and, together with the Order Form, the "Agreement").  The DealMaker Terms contain robust prohibitions against the dissemination or use of DealMaker intellectual property, trade secrets, and confidential information.

39.   Among other things, Section 4.5 of the Terms prohibits reverse engineering of DealMaker technology and intellectual property providing, in relevant part, that "[n]o User may reverse engineer, decompile, disassemble or otherwise attempt to discover the source code of the Site or any party thereof, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation."

40.   Section 5 of the Terms (Limited License) placed restrictions on the use of DealMaker intellectual property providing, in relevant part, that: "we grant you a limited, non-exclusive and non-transferable license to access and use the Site only as expressly permitted"; "[i]f you are or become a direct competitor to us, you may not access or use the Services without our explicit, advance, written consent, and then only for the purposes authorized in writing"; and "[a]ny violation by you of the license provisions contained herein may result in the immediate termination of your right to use the Site, as well as potential other claims depending on the circumstances."

41.   Section 6.1 of the Terms (General Rights) clarifies that all of the intellectual property concerning the Platform is the sole and exclusive property of Plaintiff, providing, in relevant part, that:

> All present and future rights in and to trade secrets, patents, designs, copyrights, trademarks, database rights, service marks, know-how, and other intellectual property or other proprietary rights of any type, and the technical and functional documentation for the Services ('Documentation'), any improvements, design contributions, or derivative works thereof, and any knowledge or process related thereto, including rights in and to app applications and registrations related to the Site,

shall, as between [Pieta] and DealMaker, at all times be and remain the sole and exclusive property of DealMaker.

42.     Section 6.3 of the Terms provides that "unauthorized reproduction or distribution of the software is expressly prohibited by law, and may result in civil and criminal penalties. Violators may be prosecuted."

43.     Further, Section 10.1 of the Terms prohibits any activity or the transmission of any information that is commercial in any way that violates the Terms, interferes with DealMaker's rights, and/or downloads copies of information contained on or obtained through the Platform.

44.     Additionally, Section 10.2 of the Terms prohibited using DealMaker's Services "or allow[ing] others to use them, in a manner that circumvents contractual usage restrictions or that exceeds authorized use," transfers or otherwise "makes any portion of the Services or Documentation available for access by third parties"; "[a]ccess or use the Services or Documentation for the purpose of developing or operating products or services intended to be offered to third parties in competition with the Services or allow access by a direct competitor of DealMaker."

**E.  MARBLE'S ACCESS TO PLAINTIFF'S INTELLECTUAL PROPERTY**

45.     On July 4, 2022, subsequent to the execution of the Pieta Agreement, DealMaker granted Marble and DiDonato full administrative access to the Platform. DealMaker provided DiDonato with instructions to digitize the subscription agreement terms, complete payment processing integration, link to the offering site using embeddable flow, track subscribers and finalize the subscriber onboarding questions for the Pieta offering.

46.     DiDonato further requested a review of the entire investment process, including accredited investor verification and subscriber notification.

47.     The Pieta offering launched on July 7, 2022.  On or about July 18, 2022, Marble and Werry met for dinner in Los Angeles, California.  Marble reiterated his interest in a strategic collaboration with DealMaker and using DealMaker as the technology for Crush Capital's needs.  Marble expressed concern to Werry regarding

the dim prospects for the Issuance platform and shared that it was difficult for him and Issuance to compete against DealMaker because DealMaker had such a strong reputation in the market.  Following the July 2022 dinner with Werry, Marble suggested to Werry that he leave his employment with DealMaker to join Issuance as its Head of Sales.  Werry declined.

48.    On or about August 10, 2022, Marble had a telephone call with DealMaker regarding DealMaker's enterprise functionality.  Thereafter, Marble emailed Werry to confirm that he and Todd Goldberg remained interested in a strategic collaboration with DealMaker and using DealMaker as the technology for Crush Capital's needs.

49.    On or about September 26, 2022, DiDonato had a telephone call with DealMaker personnel regarding the status of the Pieta portal.  DiDonato represented that he hoped to use the Platform to support Crush Capital and Going Public because these companies did not have the resources to build the required functionality on their own.  DiDonato again indicated that, in the long run, Crush Capital could license DealMaker's API to power its own functionality, but that Crush Capital's aspirations of someday having its own such platform were "so far down the line" that it was "almost hard to envision."

50.    Based on Marble's and DiDonato's inducements, Marble and DiDonato were granted access to, presented with, or informed about the following:

a.  DealMaker's full suite of pricing plans;

b.  vendor lists for AML/KYC;

c.  accreditation verification processes;

d.  DealMaker Compass analytics, including extensive graphs and charts that show how individual investors behave on the Platform, such as geographic location, dollar amount invested, and patent-pending predictive analytics around a prospective investor's propensity to invest (the "Propensity to Invest" technology);

e.  DealMaker Engage shareholder-cultivation functionality, including news releases and campaign highlights;

f.  DealMaker's API;

g.  DealMaker graphic user interface revealing the carefully crafted language to facilitate smooth onboarding;

h.  DealMaker's administrative dashboard illustrating the online "funnel" showing how prospects are moved through the various stages of engagement;

i.  DealMaker's extensively researched user experience design which facilitates the self-serve capabilities of the platform;

j.  instruction on how to customize the subscriber question flow and digitize subscription agreements;

k.  demonstration of how DealMaker's customer success team configures the Platform for each offering;

l.  the Platform's customization features to cater information flows to particular customer needs, preferences and characteristics; and

m. visibility into the interaction between the various Platform components and outside vendor services (how status and stages are indicated on the Platform and to the users).

51.  All of the foregoing together constitute valuable trade secrets that underpin DealMaker's success in the market at providing premium experiences for online capital raises.

52.  On or about November 4, 2022, Marble terminated the Agreement. Marble indicated that he was closing the Pieta raise, without further explanation.

53.  Through the summer of 2022 and into November 2022, Pieta's usage of the DealMaker platform was extremely unusual.  The offering was live, and the customer was incurring fees.  However, the portal was not being used.  At the time the Pieta portal was closed on November 4, 2022, not a single Pieta subscriber

funded or confirmed a single investment.  Of the thirteen (13) Pieta "subscribers" who entered information into the portal, six (6) were fake names.  Of the seven (7) remaining subscribers, only four (4) added their address to the question flow.  No subscriber uploaded or attempted to upload payment to the Platform.  These statistics remained the same as of the date of filing of this Complaint.

54.    It has since become apparent that the supposed Pieta offering was a sham, orchestrated to access and copy DealMaker Platform capabilities.

**F. DEFENDANTS' MISCONDUCT**

55.    Only a few weeks after terminating the Pieta Agreement, on November 30, 2022, Darren Marble publicly announced the release of a "new" capital raising platform, Issuance Express.  Plaintiff learned, through a series of press releases and social media posts, that for several months, Marble had been working to improve the Issuance platform to directly compete with DealMaker in the online capital raising industry.

56.    Plaintiff was shocked at the news, given that Marble had consistently represented his intent to work with DealMaker on a strategic collaboration.

57.    More troubling, upon information and belief, the new functionalities built into the Issuance platform are predicated on and copied from DealMaker's own Platform.  Marble and DiDonato, under the auspice of raising capital for Pieta, reviewed and, upon information and belief, duplicated the same features and functionality provided by the Platform, in a similar configuration and with the identical purpose – to provide an online capital raising experience that customers can use to raise capital pursuant to Regulation A, Regulation CF and Regulation D, 506(c) SEC offering exemptions.

58.    Upon information and belief, after gaining access to the Platform under the false pretenses of using DealMaker for Crush Capital's Offering and/or exploring a strategic collaboration, Issuance converted Plaintiff's intellectual property and confidential information for the purpose of forming its own competing product.

59.   After gaining access to DealMaker's confidential and proprietary technology offering real-time data that tracks and monitors capital raising efforts and funnel status, Issuance now purports to offer the same on its own competing platform.

60.   Likewise, after fraudulently gaining access DealMaker's proprietary "Propensity to Invest" technology through DealMaker Compass, Issuance purports to offer a nearly identical function named "Intent to Invest."

61.   After having gained, through Marble's deceit, access to DealMaker's pricing, Issuance now offers nearly identical pricing packages and/or pricing designed to undercut Plaintiff.

62.   Similarly, after fraudulently inducing DealMaker to grant access to its confidential and proprietary KYC and AML workflows, Issuance now purports to offer the same services.

63.   After having gained access to DealMaker's accreditation verification flow, offering streamlined accredited investor verification, Issuance now purports to offer the same services.

64.   After gaining access to DealMaker's Platform and observing how its customer service team optimizes the Platform features and components allowing customers to successfully raise their own capital, Issuance now purports to do the same, touting its "leading" "all-in" "self-serve" "upgraded" platform at half the cost of its competitors.

65.   Issuance and Marble purport to do all this - with one tenth (1/10) of the capital and resources of their "largest competitor." This, despite acknowledging at the end of September 2022 that none of Crush Capital, Issuance nor Pieta had the resources to build a platform, and as a result, needed the DealMaker Platform.  By their own admission, Defendants have not undertaken the R&D and Product Development in which DealMaker has invested significant time and resources.

66.   DealMaker built, launched and refined – and paid for – its Platform

over an eight year period.  Despite Defendants' multiple admissions in 2022 that they did not have the resources to build their own platform, including as late as September 26, 2022, two months later, by November 30, 2022, Issuance had launched its own all-in platform, offering the same products and services as the DealMaker Platform.

67.    Armed with substantial information about the Platform, and after having learned how DealMaker provides all the components required by customers to seamlessly conduct an online capital raise, Issuance is now purporting to offer the same components and undercutting DealMaker's pricing to entice DealMaker customers to leave DealMaker in favor of Issuance.

68.    Upon information and belief, Marble never had any intention of utilizing DealMaker for the Crush Capital Offering or otherwise entering into an enterprise agreement with Plaintiff.  Rather, Marble made those misrepresentations to Plaintiff to induce DealMaker to grant him access to the Platform so he could copy and steal Plaintiff's intellectual property, confidential information, and trade secrets.

69.    On December 17, 2022, Marble posted on his social media account that Issuance had "officially leapfrogged the competition."  However, upon information and belief, Issuance could only do so through the misappropriation and misuse of Plaintiff's own intellectual property, confidential information, and trade secrets.

70.    As Marble and Issuance continued to release features on the Issuance platform with striking similarity to the Platform, DealMaker undertook a forensic examination of its system to determine what information was obtained by DiDonato and Marble.

71.    Upon information and belief, DiDonato collected information to reverse engineer DealMaker's system and code a platform with the same or substantially similar suite of tools for online capital raising. To do so, Defendants created fake investors and fake transactions using multiple accounts with different emails.  DiDonato logged into the system more than 50 (fifty) times to supposedly

"test" the flow.  Daily log-ins are not required as the system automatically provides updates by email.

72.    Upon information and belief, DiDonato downloaded numerous files containing test data, and then attempted to wipe any trace of his computer activities before closing the offering.  Upon further information and belief, he continued to create fake investors under his name through October 25, 2022.  In addition, Issuance created fake accounts on October 3, 2022, October 21, 2022, and again on November 3, 2022, less than twenty-four (24) hours before Marble directed Plaintiff to close the portal.

73.    By way of Defendants' misappropriation of DealMaker's intellectual property, confidential, proprietary and trade secret information, Defendants reaped the benefits of DealMaker's significant investments of resources and money, avoiding the costs of the research and development process and crucially, the investment of time, to build a robust platform.

74.    DealMaker's intellectual property, confidential information and trade secrets are not freely available for Marble to use in his business ventures; they are proprietary to DealMaker and exemplify the time-consuming work and dedication by numerous DealMaker employees for the past eight years that still continues today.

75.    Defendants' misappropriation and conversion has already created market confusion, caused Plaintiff significant damages, including lost profits and destruction of enterprise value, and would result in an unjust forfeiture of DealMaker's extensive investment in R&D and Product Development.

## COUNT I
### Fraudulent Inducement
### (*As Against Marble*)

76.    Plaintiff repeats and realleges the allegations above as if fully set forth at length herein.

77.    Marble intentionally and falsely misrepresented his intention to enter into a strategic collaboration with DealMaker for the Crush Capital Offering and/or

to enter into an enterprise agreement with DealMaker in order to gain access to Plaintiff's Platform.

78.    Plaintiff reasonably relied on Marble's representations.

79.    In reliance on Marble's representations, Plaintiff agreed to enter into the Agreement and grant Marble and his designees access to the Platform.

80.    But for Marble's misrepresentations, Plaintiff would not have entered into the Agreement and would not have granted Marble or any of his associates access to the Platform.

81.    Marble's representations were false and known to be false at the time they were made.

82.    After gaining access to the Platform, Marble misused his access to copy Plaintiff's confidential information and trade secrets, transfer such confidential information and trade secrets to Issuance, and then use them to directly compete against Plaintiff.

83.    Plaintiff has been damaged by Marble's fraud.

84.    For these reasons, Plaintiff is entitled to an award of money damages against Marble in an amount to be determined at the time of trial.

85.    Additionally, as a consequence of Marble's deceit, bad faith, and brazen theft of Plaintiff's confidential information and intellectual property, Plaintiff is entitled to an award of punitive damages against Marble in an amount to be determined at the time of trial.

## COUNT II
### Violation of The Defend Trade Secrets Act
### (As Against Defendants)

86.    Plaintiff repeats and realleges the allegations above as if fully set forth at length herein.

87.    Defendants have misappropriated trade secrets as that term is defined in the Defend Trade Secrets Act (18 U.S.C. §1831 *et seq*.).

///

88.    The trade secrets that have been misappropriated by the Defendants are related to a product or service that is used in, or intended for use, in interstate or foreign commerce.

89.    Plaintiff's trade secrets, including designs, financial information, system integration, and similar information misappropriated by Defendants are not known to or accessible by the public.

90.    Plaintiff has taken steps to protect against the misappropriation of the trade secrets, and Defendants circumvented those steps and obtained the information under false pretenses and without the authorization of Plaintiff.

91.    Defendants are now using, or intend to use, the trade secrets in connection with the development, marketing and commercialization of a product that directly competes with Plaintiff.

92.    As a result of the misappropriation by Defendants, Plaintiff's trade secrets are now in the possession of Defendants.

93.    The trade secrets were willfully and maliciously misappropriated by Defendants.

94.    As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

95.    For these reasons, Plaintiff demands relief against Defendants for violating 18 U.S.C. §1836 in the form of damages for actual loss caused by the misappropriation, exemplary damages in the amount of two times the amount of the actual damages, an injunction directing the Defendants to delete, destroy or otherwise disable the use or access to Plaintiff's trade secrets, abandon any patent application based in any part thereon, an injunction prohibiting the Defendants from forever using the misappropriated trade secrets, and for attorneys' fees for the willful and malicious misappropriation.

///

///

1
2

**COUNT III**
**Unfair Competition and Violation of Cal. Bus. & Prof. Code § 17200, *et seq.***
**(*As Against Defendants*)**

3      96.    Plaintiff repeats and realleges the allegations above as if fully set forth

4    at length herein.

5      97.    As set forth above, Defendants have misappropriated Plaintiff's

6    confidential information, intellectual property, trade secrets, and considerable

7    investment in R&D to unfairly compete against Plaintiff.

8      98.    Defendants intentionally, knowingly, and maliciously misappropriated

9    and converted to their own use and benefit Plaintiff's confidential, proprietary and/or

10   trade secret information and materials to directly compete with DealMaker and

11   divert business away from DealMaker to Issuance.

12     99.    Defendants' actions are unlawful, unfair, and/or fraudulent.

13     100.   For these reasons, Plaintiff is entitled to compensatory and punitive

14   damages in an amount to be determined by the trier of fact and injunctive relief

15   against Defendants enjoining them from further misappropriating, disclosing from

16   making use of Plaintiff's confidential, proprietary and/or trade secret information

17   and materials and from otherwise taking unfair and unethical advantage of

18   DealMaker's confidential, proprietary and/or trade secret information and from

19   engaging from unfair competition, including without limitation, diverting business

20   away from DealMaker.

21

22

**COUNT IV**
**Conversion**
**(*As Against Defendants*)**

23     101.   Plaintiff repeats and realleges the allegations above as if fully set forth

24   at length herein.

25     102.   Plaintiff is the owner of the proprietary ideas, designs, graphical

26   depictions, and technology underling the functionality of the DealMaker Platform.

27     103.   Marble gained access to Plaintiff's property under false pretenses and

28   Defendants and/or their associates utilized that access to copy and/or steal Plaintiff's

property.

104. Defendants have exercised dominion and control over Plaintiff's property, improperly utilized it to their competitive advantage and DealMaker's competitive disadvantage, and have refused to surrender Plaintiff's property to DealMaker.

105. For these reasons, Plaintiff is entitled to an award of money damages against Defendants in an amount to be determined at the time of trial.

**COUNT V**
**Unjust Enrichment**
**(*As Against Defendants*)**

106. Plaintiff repeats and realleges the allegations above as if fully set forth at length herein.

107. Plaintiff expended, over the course of years, considerable time and resources on R&D to develop, test, and commercialize the DealMaker Platform.

108. Defendants gained access to the Platform through deceit and/or Pieta's breach of its contractual obligations to keep confidential and not use or disclose Plaintiff's proprietary intellectual property, confidential information and trade secrets.

109. It would be against equity and good conscience to permit Defendants to retain Plaintiff's proprietary intellectual property, confidential information and trade secrets.

110. For the foregoing reasons, Plaintiff is entitled to an award of monetary damages against Defendants in an amount to be determined at the time of trial.

**COUNT VI**
**Tortious Interference With Contract**
**(*In the Alternative, As Against Defendants*)**

111. Plaintiff repeats and realleges the allegations above as if fully set forth at length herein.

112. To the extent that the Agreement between Plaintiff and Pieta was not procured by fraud and therefore void *ab initio*, it is a valid and enforceable contract.

113. Marble fraudulently induced Plaintiff to enter into the Agreement with Pieta through deceit and false pretenses.

114. Plaintiff fully performed its obligations under the Agreement unless waived or excused.

115. Defendants had actual and/or constructive knowledge of the Agreement.

116. Pieta breached the Agreement by transferring or making use of confidential information and trade secrets to which Pieta was afforded access pursuant to the Agreement and subject to its prohibitions against the misuse or disclosure of the same.

117. Pieta and Issuance are under the common control of Marble.

118. Defendants intentionally caused Pieta to breach the Agreement and violate its obligations thereunder.

119. Pieta's breach of the Agreement has caused harm to Plaintiff, for which Defendants are responsible.

120. For these reasons, Plaintiff is entitled to an award of money damages against Defendants, in an amount to be determined at the time of trial.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants as follows:

A. Awarding the Plaintiff compensatory monetary damages as against Defendants.

B. Awarding the Plaintiff punitive and exemplary damages as against Defendants.

C. Awarding the Plaintiff injunctive relief against Defendants directing them to delete, destroy or otherwise disable the use or access to Plaintiff's confidential information, intellectual property, and trade secrets, prohibiting the Defendants from forever using Plaintiff's confidential information, intellectual property, and trade secrets, and further directing Defendants to abandon any patent

1    application based in any part thereon.

2        D.    Awarding the Plaintiff its reasonable attorneys' fees, costs and

3    expenses as against Defendant to the extent permitted by law;

4        E.    Such other and further relief as the Court deems just and proper.

5

6    Dated:  January 30, 2023              PAUL, WEISS, RIFKIND, WHARTON
                                           & GARRISON LLP
7

8                                          By:  /s/ Randall S. Luskey
                                               Randall S. Luskey (SBN: 240915)
9                                              rluskey@paulweiss.com

10                                         535 Mission Street, 24th Floor
                                           San Francisco, CA 94105
11                                         Tel:  (628) 432-5100
                                           Fax: (628) 232-3101
12
                                           NOVATION SOLUTIONS, INC.
13                                         (O/A DEALMAKER)
                                           Meighan Leon (SBN: 315574)
14                                         meighan.leon@dealmaker.tech
                                           1716 South Catalina Avenue
15                                         Redondo Beach, CA 90277
                                           Tel: (310) 944-8844
16
                                           WOODS OVIATT GILMAN LLP
17                                         Brian J. Capitummino (*pro hac vice*
                                           forthcoming)
18                                         bcapitummino@woodsoviatt.com
                                           Michael Ostrander (*pro hac vice*
19                                         forthcoming)
                                           fostrander@woodsoviatt.com
20                                         1900 Bausch & Lomb Place
                                           Rochester, New York 14604
21                                         Tel:  (585) 987-2800
                                           Fax: (585) 454-3968
22
                                           *Attorneys for Plaintiff Novation*
23                                         *Solutions, Inc. (O/A Dealmaker)*

24

25

26

27

28