1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| NOVATION SOLUTIONS, INC. (O/A DEALMAKER), | Case No. 2:23-cv-00696-WLH-KSx |
| Plaintiff, | **ORDER RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DOCKET NO. 61); DEFENDANT CRUSH CAPITAL'S MOTION TO DISMISS FAC (DOCKET NO. 66); AND REQUEST FOR JUDICIAL NOTICE (DOCKET NO. 67)** |
| v. | |
| ISSUANCE INC.; DARREN MARBLE; and CRUSH CAPITAL, INC., | |
| Defendant. | |

19          This matter comes before the Court on three separate motions: (1) Plaintiff

20   Novation Solutions, Inc.'s (O/A DealMaker) ("Plaintiff" or "DealMaker") Motion for

21   Preliminary Injunction (the "Motion for Preliminary Injunction") (Pl.'s Mot. for

22   Preliminary Injunction, Docket No. 61); (2) Defendant Crush Capital Inc.'s ("Crush

23   Capital") Motion to Dismiss Plaintiff's First Amended Complaint ("Motion to

24   Dismiss FAC") (Def. Crush Capital's Mot. to Dismiss FAC, Docket No. 66); and (3)

25   Crush Capital's Request for Judicial Notice in Support of its Motion to Dismiss (the

26   "RJN") (Def.'s RJN, Docket No. 67).[1]

27   _____

28          [1] On June 22, 2023, DealMaker filed a motion seeking leave to file its Second

1    With respect to the first motion, on June 22, 2023, DealMaker filed a Motion

2    for Preliminary Injunction to temporarily enjoin Defendants Issuance Inc.

3    ("Issuance"), Darren Marble ("Marble"), and Crush Capital (collectively "the

4    Defendants") from making or causing to make four allegedly false statements about

5    DealMaker and its product.  (*See generally* Docket No. 61).  In support of its request,

6    DealMaker concurrently filed declarations from Ray S. Seilie ("Seilie Declaration")

7    (Docket No. 61-1), Mat Goldstein ("Goldstein Declaration") (Docket No. 61-2), and

8    Nick Parr ("Parr Declaration") (Docket No. 61-5).  On July 14, 2023, Defendants filed

9    their Opposition to DealMaker's Motion for Preliminary Injunction (Docket No. 73)

10   and concurrently filed their Objections to DealMaker's declarations in support of its

11   Motion for Preliminary Injunction from Goldstein and Parr.  (Docket Nos. 74, 75).

12   On July 21, 2023, DealMaker filed its Reply in Support of its Motion for Preliminary

13   Injunction ("Reply") and concurrently filed its consolidated response to Defendants'

14   objections to DealMaker's Goldstein and Parr declarations (Docket No. 78), and its

15   Objections to Defendant Marble's declaration in Support of Defendants Opposition to

16   DealMaker's Request for Preliminary Injunction ("Marble Decl.").  (Docket No. 79).

17

18   _____

19   Amended Complaint ("SAC") and lodged its proposed SAC, which added three new
     claims on which the Motion for Preliminary Injunction is based.  (Docket No. 59).

20   During the pendency of the instant two motions, the parties filed a joint stipulation, in
     which the parties consented to DealMaker's Motion for Leave to Amend its SAC and

21   continuing DealMaker's deadline for filing an amended complaint to August 18, 2023.
     (Docket No. 76).  On July 18, 2023, the Court granted the parties' joint stipulation.

22   (Docket No. 76).  For purposes of the Motion for Preliminary Injunction, the Court
     will focus on the claims alleged in DealMaker's proposed SAC.  Although DealMaker

23   has not filed its SAC, as of the date of this Order, DealMaker lodged a proposed SAC
     with the Court, and both parties have fully briefed and argued the merits of the

24   proposed SAC claims.  Defendants have not raised, and thus have waived, any
     arguments related to standing given that the preliminary injunction is based on claims

25   contained in the non-operative proposed SAC.  *See e.g., Rescue 1 Financial, LLC v.*
     *Complete Debt Relief, LLC, et al.*, No. SACV2300982CJCKESX, 2023 WL 4681579,

26   at *1 (C.D. Cal. July 6, 2023).  In any event, such arguments would be an academic
     exercise that would impose unnecessary costs onto the parties because DealMaker's

27   SAC is forthcoming.

28

                                          2

1   As to the second and third motions, on June 30, 2023, Defendant Crush Capital filed
2   its Motion to Dismiss FAC as to the only remaining cause of action left on
3   DealMaker's FAC and a Request for Judicial Notice for certain exhibits.  (Def. Crush
4   Capital's Mot. to Dismiss FAC, Docket No. 66; Def.'s RJN, Docket No. 67).
5   Defendants concurrently filed the Declaration of Lilian M. Loh in Support of
6   Defendant Crush Capital's Motion to Dismiss Plaintiff's FAC ("Loh Declaration")
7   (Docket No. 66-1).  On July 14, 2023, DealMaker filed its opposition to Crush
8   Capital's Motion to Dismiss and Request for Judicial Notice.  (Docket Nos. 69, 70).
9   On July 21, 2023, Crush Capital filed its Reply in Support of its Motion to Dismiss
10  and Request for Judicial Notice.  (Docket Nos. 80, 81).  This matter is fully briefed.
11  On August 4, 2023, the Court held a hearing and heard oral arguments from all
12  parties.

13          After considering the parties' arguments and submitted evidence, and for the
14  reasons discussed below, DealMaker's Motion for Preliminary Injunction (Docket No.
15  61) is **GRANTED** in part and **DENIED** in part, Defendant Crush Capital's Request
16  for Judicial Notice (Docket No. 67) is **GRANTED**, and Defendant Crush Capital's
17  Motion to Dismiss FAC is **DENIED** (Docket No. 66).

18          Finally, the Court orders DealMaker to file a bond in the amount of $5,000 no
19  later than two weeks after the date of this Order.

20  I.     **BACKGROUND**

21          A. <u>**Facts Relevant to All Motions**</u>

22          Founded in 2015, Plaintiff DealMaker is a financial technology company,
23  which provides its users with the ability to raise capital by conducting investment
24  offerings via its online platform.  (Goldstein Decl., Docket No. 61-2 ¶ 2).  Similarly,
25  Defendant Issuance is a financial technology company with a retail capital raising and
26  investment processing platform.  (*Id.* ¶ 5).  Defendant Marble is Issuance's co-founder
27  and chief executive officer.  (*Id.* ¶ 2).  DealMaker and Issuance compete in the capital
28  raising and investment processing financial technology market.  (*Id.*).  Both

companies offer an online platform with a suite of enterprise tools for their customers to facilitate capital raising in accordance with various securities regulations.  (Marble Decl., Docket No. 73-8 ¶ 6).

DealMaker brings the instant action against Defendants alleging that Defendants stole DealMaker's trade secrets.  DealMaker's proposed SAC repeats the same allegations in its FAC but adds three new causes of action for false advertising under the Lanham Act, 15 U.S.C. § 1125(a) and California's false advertising law under California Business and Professions Code ("UCL") §§ 17200 and 17500. (Proposed SAC, Docket No. 60-1 ¶ 85).

## B. <u>Facts Specific to DealMaker's Preliminary Injunction</u>

DealMaker alleges that shortly after it initiated the instant lawsuit, Defendant Marble, on behalf of all Defendants,[2] "embarked on a marketing campaign that included disparaging remarks about DealMaker" and its products.  (Pl.'s Mem. of P&As, Docket No. 61 at 2).  Specifically, DealMaker alleges that Marble made the following four false statements:

    1. DealMaker's customers do not retain ownership over their own data;

---

[2] Defendants argue that there is no basis for enjoining Crush Capital because there is no nexus or relationship between the "injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint."  (Def.s' Opp'n, Docket No. 73 at 9–10) (citing *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015)); *see also LA All. For Hum. Rts. V. Cnty. of Los Angeles,* 14 F.4th 947, 957 (9th Cir. 2021) (finding that courts lack authority to issue an injunction on claims or defendants not pled in the complaint).  This is in part because Crush Capital is not named as a defendant in DealMaker's proposed SAC with respect to the newly proposed false advertising claims.  (*See* Docket No. 60-2 at ¶¶ 139–165).  The Court finds that there is a sufficient basis for enjoining all Defendants including Crush Capital because, as described in further detail *infra* Section V, the FAC alleges that Marble used Crush Capital and its web series as a ruse to enter into an agreement with DealMaker for the purpose of misappropriating its trade secrets.  Thus, there is a sufficient nexus or relationship between the relief sought in the preliminary injunction and the allegations in the FAC.

2. DealMaker offers the same products and services as [Issuance] at higher prices and that DealMaker's fees are charged as a percentage of capital raised;

3. DealMaker's platform does not offer "checkout in under one minute" to its customers, while Issuance's platform does;

4. DealMaker's publicly disclosed "street" valuation is $200 million.

(*Id.* at 1). DealMaker alleges that Marble made these four alleged false at a presentation on April 10, 2023, in Miami, Florida ("Deal Night Miami"), and at a presentation on June 1, 2023, in Toronto, Ontario, Canada ("Deal Night Toronto") including in an accompanying Issuance investment deck ("Investment Deck") on two slides titled "Competitive Analysis."[3]

　　　　　　　　i. *Deal Night Miami*

On April 10, 2023, Deal Night held an event in Miami, Florida. (Marble Decl., Docket No. 73-8 ¶ 8). Marble, on behalf of Issuance, participated in an interview with four other sponsors for approximately 10-15 minutes. (*Id.* ¶¶ 8–9). Although the parties dispute whether this event was publicly accessible, the interview was recorded and uploaded to YouTube where it was publicly viewable. (*Id.* ¶ 12); *see also* Deal Night Events, *The Future of Raising Capital | Issuance | Deal Night*, YouTube (May 12, 2023) https://www.youtube.com/watch?v=NPam87uNzRs. Marble spoke about various topics in response to an interviewer's questions and the audience's questions. An excerpt of the relevant questions and Marble's responses are included below:

> Q (interviewer): What makes Issuance so unique, how do you differentiate yourself from your peers?
> A (Marble): There's probably three things that differentiate us. The first is this is a white label solution. So our competitors are

---

[3] Deal Night Events ("Deal Night") is an entity, which hosts an investor conference series. (Marble Decl., Docket No. 73-8 ¶ 6). Deal Night has a marketing agreement with Defendant Issuance. (*Id.*). Participants who attend Deal Night events get an opportunity to learn about current investments while "rubbing shoulders with the best and brightest investors, entrepreneurs, and corporate leaders in the city." (Parr Decl., Docket No. 61-5 ¶ 4, Exh. 1) (citation omitted).

platforms that look like a Kickstarter homepage for equity crowdfunding. We have a system that allows you to raise capital on your own website, your own domain, so you own the investors, you control the brand. We've had clients raise 20, 30, 60 million dollars from tens of thousands of their own customers, fans, and followers using the system. So one, it's a white label. Almost every other platform is a marketplace where you list your deal alongside 200 other companies. You don't want to compete for attention. You don't want to compete for capital with 200 other businesses. You want your community to only see your deal. That's one. The second is that we're product focused. Our competitors are founded by attorneys that are pretending to be FinTech founders. So we have a FinTech cofounder. My co-founder Nick Allen is a technical prodigy. It's how we've been able to get the investor checkout time down to 40 seconds and this is the only thing we do. In our market, our competitors have broker dealers, they have transfer agents, marketing agencies. Issuance is focused on offering a superior investing platform at the lowest cost, so we're very focused.

…

Q (audience member): Who is the competitor?
A (Marble): We have competitors including DealMaker in Toronto. We have a better platform than them. They have a hundred employees. We built a better system with eleven. And then we compete with marketplace platforms like StartEngine, Wefunder, Republic.

(Muller Decl., Docket No. 73-1, Exh. 6 at 1–2, 4).

       ii. *Issuance's "Competitive Analysis" Slides Deck*

On April 3, 2023, Issuance provided the Investment Deck via email to Deal Night, which contained approximately 23 slides. (Docket No. 73-8 ¶ 20, Exh. 1). In May 2023, without notifying Marble, Deal Night posted the Investment Deck on Deal Night's website in accordance with the parties' marketing agreement. (*Id.* ¶ 21). The second slide of the Investment Deck included a disclaimer, which states in relevant part:

This deck is a summary and does not purpose to be complete. This

6

deck may contain forward-looking statements and information relating to, among other things, the company, its business plan and strategy, and its industry.  These forward-looking statements are based on the beliefs of, assumptions made by, and information currently available to the company's management… Investors are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date on which they are made. The company does not undertake any obligation to revise or update these forward-looking statements, which speak only as of the date on which they are made.  The company does not undertake any obligation to revise or update these forward-looking statements to reflect events or circumstances after such date or to reflect the occurrence of unanticipated events.

(*Id.*, Exh. 1 at 2).

Of relevance to this matter, the Investment Deck contained two slides entitled "Competitive Analysis."  (Goldstein Decl., Docket No. 61-1 ¶ 11, Exh. 4 at 18–19). The relevant portions from the two slides are copied below:



(*Id.* ¶ 12).  The above-left slide compares Issuance and DealMaker's financials, and the above-right slide is a portion of a chart that compares Issuance and DealMaker's features.  (*Id.*).  DealMaker alleges that the statements contained within the red bracketed four rows are false.  (*Id.*).

7

iii. *Deal Night Toronto*

On June 1, 2023, Marble spoke at another Deal Night event in Toronto, Ontario, Canada. (Docket No. 73-8 ¶ 25). Marble was interviewed along with five other company founders for approximately 10-15 minutes each. (*Id.* ¶ 25). During Marble's interview, a seven-slide deck consisting of a sampling of 23-slide Investor Deck was displayed on a screen behind Marble. (*Id.*). One of the featured slides included the above-mentioned right slide comparing Issuance and DealMaker's features. (*Id.* ¶ 30, Exh. 2 at 4). While the slide was on the screen, Marble stated that "consumers could raise more capital on Issuance because Issuance's system was faster than its competitors' systems and therefore easier to use." (Docket No. 61-5 ¶ 13). Marble also acknowledged that Issuance's competitors also offer other products such as broker-dealer, transfer agent, and marketing services. (*Id.* ¶ 16).

**C. <u>Facts Specific to Defendant Crush Capital's Motion to Dismiss</u>**

Defendant Marble is co-founder and co-chief executive of Defendant Crush Capital and a founding member of nonparty Pieta LLC ("Pieta"). (FAC, Docket No. 38 ¶¶ 4, 41). Crush Capital is an entertainment company that produces a web series show called *Going Public*. (*Id.* ¶ 5). The show follows aspiring corporate founders navigating through their capital raising process. (*Id.*). As an entertainment company, Crush Capital does not compete with DealMaker or Issuance. (Loh Decl., Docket No. 66-1 ¶ 2).

DealMaker alleges that Marble pitched a partnership in which Crush Capital and its aspiring corporate founders from *Going Public* would use the DealMaker Platform to raise capital. (Docket No. 38 ¶¶ 32-33). Marble claimed that even though he owned Issuance, a similar investment processing platform, he did not have "the technological capabilities to support a high volume of *Going Public* investors." (*Id.* ¶ 32). At first, Marble requested a demonstration of the platform as a "'try-before-you-buy' validation of the parties' mutual goals." (*Id.* ¶ 34). Then Marble requested to license DealMaker's platform and suggested Pieta, operating as BlueChipArt.com,

8

as its first offering to partner with DealMaker.  (*Id.* ¶ 37).  As part of this process, Marble requested that Vinny DiDonato, Chief Technology Officer at Crush Capital and Pieta be granted administrative access to the DealMaker Platform.  (*Id.* ¶ 39).

On approximately July 3, 2022, Marble signed a contract on behalf of Pieta to gain administrative access to the DealMaker Platform (the "Order Form").  (*Id.* ¶ 44). The Order Form included certain provisions requiring confidentiality and the prohibition of reverse engineering.  (*Id.* ¶ 42–51).  Based on the execution of the Order Form, DealMaker granted Defendants full administrative access to the Platform, which included confidential information and instructions for using the platform.  (*Id.* ¶¶ 52–53).

On approximately July 7, 2022, Marble launched the Pieta offering on the DealMaker Platform. (*Id.*).  The launch included Pieta offering shares in the world's largest pure silver monument of a Michelangelo replicable marble sculpture.  (Docket No. 66-1 ¶ 2).  Not a single Pieta subscriber made an investment through its platform and nearly half of Pieta's subscribers were fake.  (Docket No. 38 ¶ 60).  On November 4, 2022, Marble unexpectedly terminated the Order Form agreement.  (*Id.* ¶ 59).  On November 30, 2022, Marble announced Issuance's platform called "Issuance Express" in a press release.  (*Id.* ¶ 62).  DealMaker alleges that Issuance Express, "duplicated the same features and functionality" and looks "nearly identical" to the DealMaker Platform.  (*Id.* ¶¶ 64–81).

On June 27, 2023, the Court dismissed Causes of Action I, III, IV, V, and VI from DealMaker's FAC, leaving only one cause of action against Defendant Crush Capital for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA").  (Docket No. 64).  Defendant Crush Capital did not join Defendants Issuance and Marble's prior Motion to Dismiss Plaintiff's FAC.  (Defs' Mot. to Dismiss FAC, Docket No. 43).  Crush Capital was only added as a party to this lawsuit in DealMaker's FAC, dated April 14, 2023.  (Docket No. 38).  When Defendants Issuance and Marble filed their Motion to Dismiss Plaintiff's FAC on

1   April 28, 2023, Crush Capital had not yet been served the FAC.  (Docket No. 43 at 3).

2   Crush Capital's response was due on July 3, 2023.  (Waiver of Service, Docket No.

3   45).  Crush Capital now brings the instant Motion to Dismiss as to Cause of Action II,

4   the only remaining cause of action remaining on the FAC after the Court's Order

5   regarding Defendants Issuance and Mable's Motion to Dismiss FAC dated, June 27,

6   2023.  (Docket No. 64).

7   **II.   LEGAL STANDARD**

8       **A. <u>Preliminary Injunction</u>**

9       A preliminary injunction is an "extreme remedy that may only be awarded upon

10  a clear showing that the plaintiff is entitled to a showing of such relief."  *Winter v.*

11  *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (holding that preliminary

12  injunctions are an "extraordinary remedy never awarded as of right").  A party seeking

13  a preliminary injunction must satisfy the following four factors: (1) it is likely to

14  succeed on the merits, (2) it is likely to suffer irreparable harm if denied preliminary

15  relief, (3) the balance of equities tips in its favor, and (4) the injunction is in the public

16  interest.  *Am. Trucking Ass'ns Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009)

17  (quoting *Winter*, 555 U.S. at 20).  While the moving party must satisfy all four prongs,

18  the first factor—the moving party's likely success on the merits—is the most

19  important factor.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).  Thus, if

20  a moving party fails to satisfy this factor, then a court does not need to consider the

21  other three factors.  *Disney Enters, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir.

22  2017).  DealMaker, as the moving party, bears the burden of proving that the

23  requirements for a preliminary injunction have been met.  *Granny Goose Foods, Inc.*

24  *v. Bhd. of Teamsters and Auto Truck Drivers*, 415 U.S. 423, 443 (1974).

25      The Ninth Circuit applies a sliding scale approach to addressing each of the four

26  factors—that is, the Court may issue a preliminary injunction even if one of the

27  factors is weaker, so long as the moving party makes a threshold showing as to each

28  factor.  *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011)

1   (holding that, even if a party shows that there are only "serious questions" as to the

2   merits, rather than a likelihood of success, a preliminary injunction may nonetheless

3   issue where the "balance of hardships tips sharply in the plaintiff's favor").  "To reach

4   this sliding scale analysis, however, a moving party must, at an 'irreducible

5   minimum,' demonstrate some chance of success on the merits."  *Global Horizons,*

6   *Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007) (citing *Arcamuzi v.*

7   *Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987).

8          In deciding on an application for preliminary injunction, a court may consider

9   evidence that would be inadmissible at trial.  *See e.g.*, *Johnson v. Couturier,* 572 F.3d

10   1067, 1083 (9th Cir. 2009) ("A district court may… consider hearsay in deciding

11   whether to issue a preliminary injunction."); *see also Herb Reed Enters., LLC v.*

12   *Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013)

13   ("Due to the urgency of obtaining a preliminary injunction at a point where there has

14   been limited factual development, the rules of evidence do not apply strictly to

15   preliminary injunction proceedings.") (citing *Republic of the Philippines v. Marcos*,

16   862 F.2d 1355, 1363 (9th Cir. 1988)) ("It was within the discretion of the district court

17   to accept…hearsay for the purposes of deciding whether to issue the preliminary

18   injunction.").

19          **B. <u>Motion to Dismiss</u>**

20          Pursuant to Fed. R. Civ. P. 8(a), a "pleading that states a claim for relief must

21   contain… a short and plain statement of the claim showing that the pleader is entitled

22   to relief."  The complaint must state facts sufficient to show that a claim for relief is

23   plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The

24   complaint need not include detailed factual allegations but must provide more than

25   just a "formulaic recitation of the elements of a cause of action."  *Id.* at 555.

26          Under Fed. R. of Civ. P. 12(b)(6), a party may move to dismiss a cause of

27   action for failure to state a claim upon which relief can be granted.  A complaint may

28   be dismissed for failure to state a claim for one of two reasons: (1) lack of a

11

cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Id.*; *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court is not required to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III.   DEALMAKER'S MOTION FOR PRELIMINARY INJUNCTION

As an initial matter, Defendants objected, on various evidentiary grounds, to DealMaker's declarations of Mat Goldstein and Nick Parr, which were filed in support of DealMaker's Motion for Preliminary Injunction. (Docket Nos. 74, 75). Likewise, DealMaker objected, on various evidentiary grounds, to the Marble Declaration in support of Defendants' Opposition to the Motion for Preliminary Injunction. (Docket No. 79). All objections are overruled.

While a party moving for preliminary injunction must present "factual support beyond the allegations of the complaint" the evidence "need not strictly comply with the Federal Rules of Evidence." *CI Games S.A. v. Destination* Films, No. 16-CV-05719, 2016WL9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). A court may consider hearsay when determining whether to issue a preliminary injunction. *See Johnson*, 572 F.3d at 1083. This is because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination" and may require a party to seek relief without

the evidence in a form that would be admissible at trial. *Id.* "While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v. City of L.A.*, 119 F.Supp. 3d 1177, 1185 (C.D. Cal. 2015). Accordingly, the Court finds that all three declarations—the Goldstein and Parr Declarations in Support of DealMaker's Motion for Preliminary Injunction, and the Marble Declaration in Support of Defendants' Opposition—are reliable for the purposes of this Motion. The Court will consider the parties' declarations only for their permissible purpose and will not consider conclusions and irrelevant statements.

## A. <u>Likelihood of Success on the Merits</u>

DealMaker seeks preliminary injunctive relief based on its three causes of action claiming false advertising under the Lanham Act, 15 U.S.C. § 1125(a) and California's false advertising law under UCL §§17200 and 17500. (Docket No. 61 at 6–7). The elements of a false advertising claim under the Lanham Act are:

1. a false statement of fact by the defendant in a commercial advertisement about its own or another's product;

2. the statement actually deceived or has the tendency to deceive a substantial segment of its audience;

3. the deception is material, in that it is likely to influence the purchasing decision;

4. the defendant caused its false statement to enter interstate commerce; and

5. the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

Similarly, California's UCL § 172000 "prohibits any 'unlawful, unfair or fraudulent business act or practice.'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934,

13

938 (9th Cir. 2008) (quoting Cal. Bus. & Prof. Code § 17200).  California's false advertising law claim under UCL § 17500 prohibits any "unfair, deceptive, untrue, or misleading advertising."  *Id.* (quoting Cal. Bus. & Prof. Code § 17500).  "The California Supreme Court has recognized 'that these laws prohibit not only advertising, which is false, but also advertising which… although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  *Id.* (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 951, 119 (2002)).  Significantly, the Ninth Circuit has held that UCL claims are "substantially congruent to claims made under the Lanham Act."  *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (internal quotations and citation omitted).

DealMaker argues that it prevails on the merits of its UCL claims and the first element of its Lanham Act claim by establishing that the four statements are false. The Court will address each of the elements in turn.

### i.  *Literal Falsity*

When analyzing whether the statement is literally false, the statement must be viewed in its full context.  *Southland*, 108 F.3d at 1139.  "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers."  *Id.* (internal citation omitted).  Statements are literally false by necessary implication where "the audience would recognize the claim as readily as if it had been explicitly stated."  *Aussie Nads U.S. Corp v. Sivan*, 41 F. App'x 977 (9th Cir. 2002).  If the statements are false-by-necessary implication, "[o]nly an unambiguous message, however, can be literally false*." Suzie's Brewery Co. v. Anheuser-Busch Companies, LLC*, 519 F. Supp. 3d 839, 846 (D. Or. 2021) (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)).  In other words, "if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false."  *Id.*

14

*a. Ownership Of Dealmaker's Customers' Data*

The first statement at issue is that DealMaker's customers do not own their data in contrast to Issuance's customers who do own their data. This allegedly false statement appears in the above-mentioned Investor Deck from Marble's Deal Night Toronto presentation. (Docket No. 61-2 ¶ 12). The relevant slide states, "Clients Owns Their Data" and includes an "X" in the column under DealMaker's name and a checkmark in the column under Issuance's name. DealMaker argues that the falsity of the statement is not only that DealMaker's customers do not retain ownership of their data, but also if Issuance's customers do.

In support of their arguments, both parties undertake an analysis of their respective client agreements as it relates to customer data. DealMaker claims that provisions contained in its Subscription Order (also known as the "Contract Terms") pertaining to DealMaker's protection of its client's confidential information allow customers to retain their data. (*See* Goldstein Decl., Docket No. 61-2 ¶ 19; *see also* Parr Decl., Docket No. 61-5 ¶ 14). The Contract Terms provide, in relevant part:

> 3) **Confidential Information**
>   a. This Agreement, the terms contained hereunder and certain information related to the Customer transaction contemplated hereunder is **"Confidential Information"** such that it does not include information that: (i) is or has become generally known to the public; (ii) was known by either party prior to entering into the Agreement: or (iii) was independently determined by either party. All work product, pricing, deal terms and process information of either party exchanged with the other party to perform the terms of the Agreement is agreed to be Confidential Information, except any logos or marketing references are not Confidential Information.
>   b. Neither party may disclose Confidential Information without the express written consent of the other party.

(*Id.*) (emphasis in original). Moreover, DealMaker claims the lack of any mention of the transfer of ownership of confidential data in its Contract Terms and Terms of Service ("TOS") indicates that clients own their own data. (*Id.*).

1    Defendants counter that DealMaker's failure to affirmatively address

2    DealMaker's use of client's data is itself evidence that DealMaker's clients do not

3    own their own data.  (Defs' Opp'n, Docket No. 73 at 12–13).  Instead, Defendants

4    argue that ownership of data is defined as "sole control over the use of its data" as is

5    the case in Issuance's own contract terms.  (Id. at 12) (emphasis in original).  For

6    example, Issuance's contract terms state:

> [Issuance] and Customer [i.e., the entity licensing the software to
> conduct an offering] acknowledge that, as between Company and
> Customer, Customer owns and shall remain the sole owner of the
> information, data, and other content, in any form or medium, that is
> submitted, posted, or otherwise transmitted by or on behalf of
> Customer, or any user [i.e. investors] through the Platform or
> otherwise collected from Customer in connection with the Services
> (collectively, 'Offering Data'). Customer hereby grants to Company
> a perpetual, nonexclusive, irrevocable, royalty-free, worldwide
> license to reproduce, distribute, modify, retain, and otherwise use and
> display Offering Data and perform all acts with respect to such
> Offering Data as may be necessary for Company to provide the
> Services to Customer and to communicate with Customer regarding
> the Services, account matters and other Company service offerings.

16   (Docket No. 73-8 ¶ 42).  Defendants claim that because DealMaker's TOS provides

17   that DealMaker may "use" client's data for DealMaker's marketing purposes, clients

18   do not own their own data.  (Docket No. 73 at 12–13).  Defendants also cite anecdotal

19   evidence from a prior DealMaker customer indicating that DealMaker "exploited and

20   misused the customer's investor list for the purpose of contacting its investors to

21   market other companies' securities offerings listed through DealMaker.  (Marble

22   Decl., Docket No. 73-8 ¶ 40).  DealMaker counters that Issuance's own terms do not

23   grant its customers full ownership as it also includes a provision that allows Issuance

24   to license its data.  (Docket No. 77 at 4).

25   Here, the comparison of each respective party's contract terms does not support

26   that the statement in question is literally false, because the statement "Client Owns

27   Their Data" is ambiguous.  As DealMaker concedes, its Contract Terms and TOS are

28

16

completely silent as to the issue of the ownership of its client data.  (Goldstein Decl., Docket No. 61-2 ¶ 19) ("[N]othing in the DealMaker contract transfers ownership of that confidential data to DealMaker").  DealMaker claims that this silence is affirmative proof that clients own their data.  (*Id.*).  To fill the gap, DealMaker argues that the confidentiality of client data provisions within its Contract Terms covers the ownership of client data.  (*Id.*).  Maintaining confidentiality over data, however, is not the same as providing a client ownership over their data.  Even if, maintaining confidentiality over client data was synonymous with providing a client ownership of the data, it is unclear if this provision applies to all client data.  The term "Confidential Information" as defined in the Contract Terms lists certain enumerated types of client data but goes on to exclude "logos or marketing references are not Confidential Information." (*Id.*).  Similarly, Issuance's customer agreement suffers from the same ambiguity.  Although its agreement clearly states that a customer owns its data, it also grants Issuance a license to use the data for purposes including providing client services and other service offerings.

Based on the evidence presented by DealMaker, the Court is unable to determine whether this statement is literally false on its face, false by necessary implication, or literally true but misleading.  *See Costal Abstgract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732 (9th Cir. 1999) (finding that a literally false statement must be more than mere "puffery" and must be "clearly one of fact, able to be proven true or false.").  This statement cannot be viewed as false by necessary implication because the message is ambiguous as to what ownership of data entails.  *Suzie's Brewery*, 519 F.Supp.3d 839 at 846 ("Only an unambiguous message, however, can be literally false.").  Lastly, DealMaker has not proffered any evidence that even if the statement were true, it may mislead, confuse, or deceive consumers.  *See e.g. Am. Home Prod. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978) ("It is equally well established that the truth or falsity of the advertisement usually should be tested by the reactions of the public").  Accordingly, DealMaker has

1    failed to meet its burden of showing that this statement is literally false.

2                    *b. DealMaker's Products and Fees*

3           The second false statement involves whether DealMaker offers the same

4    products and services as Issuance, and if so, whether those fees are higher as a

5    percentage of capital raised compared to Issuance.  (Docket No. 61 at 7).  This

6    allegedly false statement appears on the above-mentioned "Comparative Analysis"

7    slide within the Investor Deck presented at the Deal Night Toronto event.  (Goldstein

8    Decl., Docket No. 61-2 ¶ 12).  The slide states that DealMaker charges "8-10%" "fees

9    as % of Capital Raised" compared to Issuance's 4-5% for the same fee.  (*Id.*).

10          First, DealMaker argues that while it does offer some similar products as

11   Issuance, its offers do not entirely overlap with Issuance and thus any one-to-one

12   comparison of fees between the parties is literally false.  (Docket No. 61 at 7).

13   Second, DealMaker claims that it does not take fees as a "percentage of capital

14   raised."  (*Id.* ¶ 15).  Rather, DealMaker's fees "depend entirely on the services the

15   customer purchases…."  (*Id.*).

16          Defendants counter by providing two examples of DealMaker's contracts with

17   other customers indicating what Defendants argue is a fee structure of 8-10%.

18   (Marble Decl., Docket No. 73-8 ¶¶ 44–49).  In its Reply, DealMaker distinguishes

19   those contracts and fees because the contracts are with DealMaker Securities LLC, a

20   registered broker dealer, which is a separate legal entity and not a party to this lawsuit.

21   (Reply Decl. of Mat Goldstein ("Goldstein Reply Declaration"), Docket No. 77-1 ¶ 2–

22   4).  DealMaker also explains that its fees may be higher because it offers additional

23   services to its clients that Issuance does not.  (*Id.*)

24          Here, DealMaker fails to meet its burden of showing that this statement is

25   literally false.  As an initial matter, DealMaker's characterization of the allegedly false

26   statement is inaccurate.  The "Comparative Analysis" slide makes no mention of

27   whether DealMaker and Issuance offer the same products.  (Docket No. 61-2 ¶ 12).

28   Instead, the slide only states that DealMaker's "fees as % of capital raised" is "8-

10%." (*Id.*).   Because the statement does not discuss whether the parties provide the same products, the statement cannot be false on the basis that the company provides different products.

Even assuming the parties' services and products were not comparable, it does not negate the factual accuracy of the statement.   DealMaker interprets this statement as Defendants' advertising that DealMaker structures its fees as a "percentage of capital" raised.   Another potentially reasonable reading of the statement is that in the aggregate, DealMaker's fees equate to 8-10% of the capital it raises.   Similar to the first allegedly false statement, this statement suffers from ambiguity and alternative reasonable interpretations making it not literally false.   *Suzie's Brewery*, 519 F.Supp.3d at 851 n.9. (citing *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999) opinion amended on denial of reh'g, 203 F.3d 1175, 1210 (9th Cir. 2000)) ("To be ambiguous, a statement must have at least two reasonable alternative meanings").

DealMaker's declarations only provide conclusory statements that its products are not comparable with Issuance and that its fees are not charged as a "percentage of the capital raised." (Docket No. 61-5 ¶ 15).   DealMaker's Goldstein Reply Declaration explains that Defendants' examples of client contracts showing the 8-10% fee amounts are false because the contracts shown are between the third party and DealMaker Securities LLC, a separate entity from Plaintiff.   (Pl.'s Reply, Docket No. 77 at 5–6).   It is not enough to prevail simply by showing that Defendants' claim is unsubstantiated because this does not necessarily make Defendants' statement false. *See e.g., U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1248 (D. Ariz. 1981), aff'd, 681 F.2d 1159 (9th Cir. 1982) (internal quotations and citation omitted)  ("The plain language of [the Lanham Act] prohibits false rather than unsubstantiated representations [and] requires that a plaintiff establish not merely that the defendant's claims lack substantiation but also that it is false or deceptive.").   Ultimately, the onus is on DealMaker to demonstrate that this statement is false.   DealMaker fails to

provide any explanation or supporting evidence to show that its fees are not structured in this manner, or that this statement is literally false.

### c. *"Checkout in Under One Minute"*

The third allegedly false statement is that DealMaker's platform does not offer "checkout in under one minute" to its customers, while Issuance's platform does. This allegedly false statement appears in the same above-mentioned Investor Deck from Marble's Deal Night Toronto presentation. (Docket No. 61-2 ¶ 12). The relevant slide states, "Checkout in Under 1 Min." and includes an "X" in the column under DealMaker's name and a checkmark in the column under Issuance's name. (*Id.*). Defendants argue that this alleged false statement is actually two separate ideas: (1) Issuance's platform offers sub-one minute checkout; and (2) DealMaker does not offer a sub-one minute checkout. (Docket No. 73 at 16). Defendants further argue that DealMaker failed to meet its burden because the Goldstein Declaration states that checkout times may vary depending on several factors and cannot be distilled into a mathematical calculation. (*Id.*). Lastly, Defendants claim that DealMaker's marketing materials are self-serving and at least one of the marketing materials is ambiguous as to DealMaker's sub-one minute checkout claim amounting to impermissible "mere puffery." (*Id.*); *see e.g.* 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.04[4][d] at 27–52 (3d ed.1994). ("Puffing" is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under § 43(a)").

Here, the Court finds that DealMaker has met its burden to establish the likelihood that this statement will be found to be literally false. First, the Court disagrees with Defendants' assertion that DealMaker is attempting to "sweep in two separate ideas into this statement." (Docket No. 73 at 16). The slide clearly displays a comparison of the existence of this feature on both DealMaker and Issuance's platforms. As DealMaker argues, the false statement is whether DealMaker's platform is capable of a sub-one minute checkout. (Docket No. 77 at 7). The Court

finds that this statement is literally false based on the evidence proffered in the Goldstein Declaration, which explains that Mr. Goldstein "works closely with DealMaker's product team who manages… 'the online checkout' process'" and verified that he was able to checkout on the DealMaker platform in less than a minute. (*Id.* ¶ 12).  Furthermore, a specific and measurable advertisement claim of product superiority based on product testing is not puffery. *See Castrol Inc. v. Pennzoil Co*., 987 F.2d 939, 946 (3d Cir. 1993) (finding that claim that motor oil offered better protection against engine wear was not puffer because it provided "specific and measurable" comparative research); *see also W.L. Gore & Assocs., Inc. v. Totes Inc*., 788 F.Supp. 800, 809 (D.Del.1992) (numerical comparison that product is seven times more breathable "gives the impression that the claim is based upon independent testing" and "is not a claim of general superiority or mere puffing").  DealMaker also provided its marketing materials in which it announced the launch of its new mobile checkout, which allows customers to checkout "in under a minute."  (*Id.* ¶ 18, Exh. 2).

### d.  DealMaker's "Street" Valuation

The fourth allegedly false statement is that DealMaker's publicly disclosed "street" valuation is $200 million.  This statement is contained within two locations: (1) the "Competitive Analysis" slide in the Investor Deck presented at Deal Night Toronto, and (2) a statement Marble made during Deal Night Miami.[4]  (Docket No. 61-2 ¶ 23–24).  The slide states that DealMaker's "street estimate" valuation is approximately $200 million with revenue of $20 million and a "price/sales" multiplier of "10X."  (*Id.*).  Marble explains that he arrived at the $200 million valuation by multiplying DealMaker's $20 million estimated revenue for 2022 by a multiplier of ten.  (Docket No. 73-8 ¶ 59).  Marble derived the multiplier, called the "price/sales"

---

[4] DealMaker incorrectly states that Marble made this statement at Deal Night Toronto, presumably because that was the event in which the Investor Desk was presented.  (Docket No. 61-2 ¶ 24).  A review of the Deal Night Miami video shows that this statement actually occurred at Deal Night Miami.  (Docket No. 73-8 ¶ 12).

amount in the Investor Slide, by using an "average valuation multiplier" for similar types of companies. (*Id.* ¶¶ 59-60).   Further, Marble stated the following at Deal Night Miami:

> [Issuance] is raising capital at the most attractive valuation in our industry by a factor of several $100 million we're several $100 million less expensive than our main competitors that are raising at 200, 500, $1 billion dollars.  Issuance has a superior product and market at a lower cost than our competition.

(*Id.* ¶ 24).  DealMaker argues that as a private company, DealMaker does not have a public valuation and thus this number is fabricated and false. (Docket No. 61 at 8).  Conversely, Defendants argue that the slide proposed a "street estimate," which is an industry term for an unofficial estimate and not a "publicly disclosed valuation" as suggested by DealMaker.  (Docket No. 73 at 17).

Here, the Court finds that Dealmaker has failed to establish that it is likely to succeed on the merits regarding the literal falsity of the fourth statement regarding DealMaker's valuation.  The Court finds the term "street estimate" sufficiently ambiguous that it is susceptible to the interpretation/calculation proffered by Marble in support of the statement.

### ii. *Deception and Materiality*

The second element under the Lanham Act requires that the statement actually deceive or has a tendency to deceive a substantial portion of consumers. *Southland*, 108 F.3d at 1139.  With respect to DealMaker's Lanham Act claims, statements that are literally false are presumed to have a tendency to deceive. *See Time Warner Cable*, 497 F.3d at 153.  With respect to DealMaker's UCL claims, "[a]cutal deception or confusion caused by misleading statements is not required" to establish a violation of Sections 17200 and 17500. *Day v. ATT&T Corp.*, 63 Cal. App. 4th 325, 332 (1998).

Given the Court's finding that Dealmaker is likely to succeed in proving the literal falsity of statement three, there is a presumption that the statements had a

tendency to deceive. *Time Warner*, 497 F.3d at 153. Moreover, DealMaker's Goldstein and Parr Declarations sufficiently demonstrate that the statement at issue was likely to deceive. The statement was published and promoted on an investor industry website, presented at a forum focused on connecting potential investors and company founders, and was directed at an audience of potential investors attending industry events where potential clients in this industry are the most susceptible to being deceived by the false statements.

### iii. *Interstate Commerce*

The third element requires that Defendants caused the statement to enter interstate commerce. Here, the false statement appeared on the Investor Deck, which Issuance created and e-mailed to Deal Night who eventually published it to its public website per the parties' marketing agreement. (Docket No. 73-8 ¶ 21). This is sufficient to show that the false statement entered interstate commerce.

### iv. *Injury*

As to the last element, DealMaker has demonstrated a likelihood to be injured as a result of the false or misleading statement. Commercial injury can be "generally presumed" when the parties "are direct competitors and defendant's misrepresentations has a tendency to mislead consumers." *ThermoLife Intl', LLC v. Gaspari Nutrition Inc.,* 648 F. App'x 609, 615 (9th Cir. 2016) (quotation omitted). A jury can "infer injury based on evidence of direct competition (which provides a causal link) and a likelihood of consumer deception." *Id.* at 616.

Here, there is no question that Defendant Issuance and DealMaker are direct competitors. (Docket No. 73-8 ¶¶ 15–16). Given that literal falsity likely exists as to one of the statements, commercial injury can be generally presumed. *Id.* at 615. Defendants do not rebut this presumption.

### B. **Irreparable Harm**

The second factor that a moving party seeking a preliminary injunction must establish is that they are "likely to suffer irreparable harm in the absence of

23

preliminary relief." *Am. Trucking Ass'ns Inc.*, 559 F.3d at 1052 (quoting *Winter*, 555 U.S. at 20). Parties seeking preliminary relief are required to demonstrate that irreparable injury is likely in the absence of an injunction, not merely speculative. *Winter*, 555 U.S. at 22 (citing Wright & Miller, Federal Practice and Procedure § 2948.1). The party must show that remedies "available at law, such as monetary damages, are inadequate to compensate for the injury." *Herb Reed Enters, LLC v. Fla Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).

The Lanham Act was amended in 2020 to provide a rebuttable presumption of irreparable harm in preliminary injunction matters once there is a finding of the likelihood of success on the merits. 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits….").

Here, DealMaker has demonstrated a likelihood of success on the merits as to one false statement, and thus it is entitled to a rebuttable presumption of irreparable harm. Defendants have not rebutted this presumption.[5] *See e.g., AK Futures Ltd.*

_____

[5] Defendants argue that DealMaker lacks standing to bring this Motion because its request is moot. (Docket No. 73 at 22). Upon being notified of DealMaker's Motion, Defendant Marble contacted Deal Night and had the Investor Deck and Deal Night Toronto video removed from Deal Night's website. (Docket No. 73-8 ¶ 66). Further, Marble's declaration states that he has not presented the Investor Deck or discussed the four statements at issue since June 11, 2023. Voluntarily ceasing the conduct, however, does not necessarily moot the need for injunctive relief. *See e.g., Cherokee Inc. v. Wilson Sporting Goods Co*., No. CV 15-04023 BRO EX, 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015) (internal citation and quotation mark omitted) ("[T]o render the need for an injunction moot, "the reform of the defendant must be irrefutably demonstrated and total; if there is a substantial possibility that the act sought to be enjoined may be repeated, the matter is not necessarily mooted."); *accord Lyons P'ship, L.P. v. Morris Costumes, Inc*., 243 F.3d 789, 800 (4th Cir.2001) ("[D]efendants 'face a heavy burden to establish mootness in such cases because otherwise they would simply be free to return to [their] old ways after the threat of a lawsuit has passed.'" (second modification in original) (internal quotation marks omitted) (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 72, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983)). Because Defendants may resume making the statement in future presentations, DealMaker's Motion is not moot.

24

*Liab. Co. v. Boyd St. Distro, Ltd. Liab. Co.*, 35 F.4th 682, 694 (9th Cir. 2022) (holding that the moving party was "entitled to a rebuttable presumption of irreparable harm on its trademark claim because [it] has shown it will likely succeed on the merits"). Accordingly, this factor weighs in favor of granting a preliminary injunction.

### C. **Balance of Equities**

The third factor that courts consider in determining whether to issue a preliminary injunction is whether "the balance of the equities" tips in the moving party's favor. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). This factor requires courts to "balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).

Here, the balance of the equities tips in the favor of DealMaker with respect to its Lanham Act claims because of DealMaker's likelihood of demonstrating that Defendants' statement regarding DealMaker's sub-one minute checkout time was literally false. Allowing this false statement to exist, especially in this context—investor pitch materials—can significantly damage DealMaker's ability to secure future customers. Because the statement is literally false, Defendants will not face any hardship by being enjoined from making the statement. *See POM Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-02633, 2008 WL 42222045, at * 16 (C.D. Cal. July 17, 2008), *aff'd*, 362 F. App'x 577 (9th Cir. 2009) ("Indeed, there is no harm to a defendant from an injunction which prevents continuing dissemination of false statements."). Accordingly, this factor weighs in favor of granting a preliminary injunction.

### D. **Public Interest**

The fourth factor courts must consider in determining whether to issue a preliminary injunction is whether "an injunction is in the public interest." *Am. Trucking Ass'ns*, 559 F.3d at 1052 (quoting *Winter*, 555 U.S. at 20). The public interest is served when a defendant "is asked to do no more than abide by trade laws

and obligations of contractual agreements…." *Henry Schein*, 191 F. Supp. 3d at 1078 (citing *Bank of Am., N.A. v. Lee*, 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008)). "There is a strong public interest in preventing false advertising of products in the marketplace." *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. CV 14-03954, 2014 WL 4187982, at *6 (C.D. Cal. Aug. 22, 2014).  Because the products in this matter involve investments and securities, the public interest is furthered by having a transparent and accurate financial market.  Accordingly, this factor weighs in favor of granting a preliminary injunction.

## IV.   DEFENDANT CRUSH CAPITAL'S REQUEST FOR JUDICIAL NOTICE

On a motion to dismiss, the Court may consider "only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012); *see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (finding that under the 12(b)(6) standard, "if a district court considers evidence outside of the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment…."). A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c).  That is, the party requesting judicial notice must show that the fact "is not subject to reasonable dispute" because it is either generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quotation omitted); Fed. R. Evid. 201(b).

Defendants ask the Court to take judicial notice of three exhibits attached to the Loh Declaration.  (Loh Delc., Docket No. 67).  The exhibits are all publicly available on various websites.  The Court may take judicial notice of the content of the exhibits and the fact that this content was publicly available.  *Id.*; *see also Galindo v. Ocwen Loan Servicing, LLC*, 282 F. Supp. 3d 1193, 1196 (N.D. Cal. 2017) ("Matters of

public record are the appropriate subjects of judicial notice."); *see also Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 763 (C.D. Cal. 2015) ("finding that a court "may take judicial notice of the fact that an internet article is available to the public, but they may not take judicial notice of the truth of the matters asserted…."). The Court considers the exhibits by category.

As to Exhibits 1–3, they are available on publicly available websites including YouTube, a social networking post on DealMaker's LinkedIn, and a Yahoo! Finance article, respectively. (Docket No. 67 ¶ 5). DealMaker objects to the admission of all three exhibits on the basis that they are irrelevant to the issues presented in Defendant Crush Capital's Motion to Dismiss. (Docket No. 70 at 2–3). "Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time…." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *see also MACOM*, 2019 WL 4282906, at *1 ("Information on [publicly] accessible articles or websites is subject to judicial notice of the fact that the information was available to the public because such availability is not subject to reasonable dispute."); *Spy Optic*, 163 F. Supp. 3d at 762 (granting request for judicial notice "with respect to [an] internet article, but only as an indication of what information was in the public realm at the time"). The Court **GRANTS** Defendant Crush Capital's request and takes notice of the information in these exhibits and of their public availability, but it does not take notice of the truth of the matters asserted.

## V.   DEFENDANT CRUSH CAPITAL'S MOTION TO DISMISS

### A. <u>Background</u>

Defendant Crush Capital's Motion focuses on the second element of a trade secret misappropriation claim pursuant to the Defend Trade Secrets Act ("DTSA"). (*See generally* Docket No. 66). The crux of Crush Capital's argument is that the FAC fails to allege that Crush Capital took any independent action to improperly acquire, disclose, or use DealMaker's trade secrets. (*Id.*). Rather, Crush Capital's only alleged connection to the trade secret misappropriation is that two of its executive officers—

27

1  Marble and DiDonato—are alleged to have stolen DealMaker's trade secrets.  (*Id.*).

2  DealMaker argues that Crush Capital's motion fails for the sole reason that companies

3  act through their employees and officers, and thus it is a reasonable inference that

4  when two of Crush Capital's highest-level executives misappropriated DealMaker's

5  trade secrets, they did so on behalf of Crush Capital.  (Docket No. 69 at 4).

6       **B.  <u>Misappropriation of Trade Secrets</u>**

7       A plaintiff must allege the following elements in a trade secret misappropriation

8  claim under DTSA: "(1) the plaintiff owned a trade secret; (2) the defendant

9  misappropriated the trade secret; and (3) the defendant's actions damaged the

10  plaintiff." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal.

11  2018) (citations omitted) (internal quotation marks omitted).  DTSA defines

12  "misappropriation" as either (1) the "[a]cquisition of a trade secret by another person

13  who knows or has reason to know that the trade secret was acquired by improper

14  means;" or (2) the "[d]isclosure or use of a trade secret of another without express or

15  implied consent." 18 U.S.C. § 1839(5).  A moving party only needs to demonstrate

16  either the acquisition, disclosure, or use of the trade secret in order to establish the

17  misappropriation element.  *Id.*  In the present matter, the FAC pleads sufficient facts

18  to state that Crush Capital improperly acquired and used DealMaker's trade secrets

19  through Marble and DiDonato.  Around March 2022, Marble, who is a founding

20  member of Crush Capital, approached DealMaker to form a strategic partnership in

21  which Crush Capital and its aspiring corporate founders from its web series would use

22  the DealMaker Platform to raise capital.  (Docket No. 38 ¶¶ 32-33).  Defendant

23  Marble secured a licensing agreement on behalf of Defendant Issuance to use the

24  DealMaker platform, and Marble suggested launching an offering with Marble's other

25  company, Pieta.  (*Id.* ¶ 34).  DiDonato, who is an executive at both Crush Capital and

26  Pieta was granted administrative access to the DealMaker platform to facilitate the

27  Pieta offering.  (*Id.* ¶ 39).  The FAC alleges that Marble and DiDonato induced

28  DealMaker into a partnership that would eventually allow DiDonato to reverse

1   engineer and misappropriate DealMaker's trade secrets.  (*Id.* at 1-6).

2           Crush Capital's reliance on *Arthur J. Gallagher & Co. v. Tarantino*, 498 F.

3   Supp. 3d 1155, 1173 (N.D. Cal. 2020) is unavailing.  In *Tarantino*, plaintiff alleged

4   that its competitor poached four of its employees and instructed them to steal

5   plaintiff's trade secrets.  (*Id.* at 1159-61).  The court in that matter dismissed the trade

6   secret claim against the competitor company (but not against the individual

7   employees) because the complaint failed to allege that the competitor company gave

8   them the directive to steal the trade secrets.  *Id.* at 1173.  Plaintiff, in that matter,

9   argued that the court could reasonably infer that the competitor gave the directive

10  because of the competitor's past pattern and practice of stealing trade secrets from

11  competitors and cited two cases.  *Id.*  This matter is distinguishable.  As DealMaker

12  points out, Crush Capital did not need to give the directive to steal the secrets to other

13  employees because Marble is the high-level executive at Crush Capital who "would

14  have been the very person in a position to provide instructions in the first place."

15  (Pl.'s Opp'n to Mot. to Dismiss, Docket No. 69 at 10).  Instead, Crush Capital, which

16  is in effect Marble as the co-founder and managing member, is alleged to have been

17  used as the hook to lure DealMaker into the partnership that would lead to the

18  misappropriation of trade secrets.  Thus, the Court can make a reasonable inference

19  that Marble and DiDonato were acting on Crush Capital's behalf when they allegedly

20  misappropriated DealMaker's trade secrets.

21          Lastly, there is no requirement at this phase of the proceedings that DealMaker

22  allege exactly how the Defendants misappropriated the trade secrets.  *Autodesk, Inc. v.*

23  *ZWCAD Software Co.*, No. 5:14-CV-01409-EJD, 2015 WL 2265479, at *6 (N.D. Cal.

24  May 13, 2015) (internal quotations and citations omitted) (finding that because

25  "discovery has not yet commenced… it would be unreasonable to require a plaintiff to

26  demonstrate the precise ways in which Defendants may have used [their] trade secrets,

27  given that Defendants are the only ones who possess such information.").

28

## VI.   BOND

Pursuant to Fed. R. Civ. P. 65(c), Plaintiff must post a bond, in a sum the Court deems appropriate for the payment of costs and damages that Defendants may suffer if it is later found to have been wrongfully enjoined.  A bond may not be required, or may be minimal, when the harm to the enjoined party is slight or where the movant has demonstrated a likelihood of success.  *See, e.g., Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).  Because the Court is granting DealMaker's Motion for Preliminary Injunction as to only one statement, the Court orders Plaintiff to file a bond in the amount of $5,000 by no later than two weeks after the date of this Order.  The Court finds this nominal amount appropriate given the facts of this case.

## VII.   CONCLUSION

Based on the foregoing discussion, the Court **GRANTS** in part and **DENIES** in part DealMaker's Motion for Preliminary Injunction (Docket No. 61), **GRANTS** Defendant Crush Capital's Request for Judicial Notice (Docket No. 67), and **DENIES** Defendant Crush Capital's Motion to Dismiss FAC (Docket No. 66).

Accordingly, Defendants, and all persons acting in concert with them, are restrained from making or causing to make the following statement:  That DealMaker's platform does not offer "checkout in under one minute" to its customers.

Finally, the Court orders DealMaker to file a bond in the amount of $5,000 no later than two weeks after the date of this Order.

**IT IS SO ORDERED.**

Dated:  August 16, 2023

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE